# IN THE SUPREME COURT, STATE OF WYOMING

## 2025 WY 15

### OCTOBER TERM, A.D. 2024

#### January 31, 2025

CHESAPEAKE EXPLORATION, LLC,
an Oklahoma limited liability company,

Appellant
(Defendant),

v.

MORTON PRODUCTION
COMPANY, LLC, a Wyoming limited
liability company,

Appellee
(Plaintiff).

S-24-0123

*Appeal from the District Court of Converse County*
The Honorable F. Scott Peasley, Judge

*Representing Appellant:*
William E. Sparks, Woodlands, Texas.

*Representing Appellee:*
J. Kyle Hendrickson, Amanda K. Roberts, Blake T. Godwin, Lonabaugh and Riggs, LLP, Sheridan, Wyoming. Argument by Mr. Hendrickson.

*Before FOX, C.J., and BOOMGAARDEN, GRAY, FENN, and JAROSH, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**JAROSH, Justice.**

[¶1]    Chesapeake Exploration, LLC (Chesapeake) and Morton Production Company, LLC (Morton) entered into an agreement governing the development of oil and gas resources in Converse County, Wyoming.  Morton filed an action against Chesapeake for breach of contract, violation of the Wyoming Royalty Payment Act (WRPA), and conversion after Chesapeake adjusted Morton's ownership interest and withheld a share of production proceeds from the parties' joint operating account.  In response, Chesapeake asserted counterclaims against Morton for breach of contract, unjust enrichment, and breach of the implied covenant of good faith and fair dealing.  Following cross-motions for summary judgment, the district court granted summary judgment in favor of Morton in a series of orders.

[¶2]    On appeal, Chesapeake challenges:  (1) the district court's order granting summary judgment to Morton on its breach of contract claim; (2) its supplemental decision granting summary judgment to Morton on Chesapeake's unjust enrichment and implied covenant claims, and on its affirmative defenses; and (3) its determination that Chesapeake violated the WRPA.

[¶3]    We affirm.

## *ISSUES*

[¶4]    Chesapeake stated five issues on appeal and Morton stated three.  We find the following issues dispositive:

1.    Did the district court err when it granted summary judgment on Morton's breach of contract claim?

2.    Did the district court err when it relied on Wyoming Rule of Civil Procedure (W.R.C.P.) 60(a) to address omissions in its Original Order?

3.    Did the district court err when it determined Chesapeake violated the WRPA?

## *FACTS*

[¶5]    On March 3, 2008, the parties entered into a joint operating agreement to develop several oil and gas leases.  Chesapeake, an oil and gas exploration company, assumed the role of operator.  Morton, holding interests within the planned development area, was assigned a non-operator role.  The joint operating agreement established the overall

1

structure and framework governing the exploration and operation of any wells drilled within the contract area.

[¶6] After the contract area was unitized as the Northwest Fetter (Deep) Unit, Chesapeake executed a Unit Operating Agreement (UOA) on May 5, 2010. Morton joined its interests in the Unit and became a party to the UOA. Morton also elected to participate in Chesapeake's proposal to drill the Northwest Fetter (Deep) Unit 33-71 7-1H Well (Well). As a result, Morton's working interest allowed it to receive a portion of the production proceeds from the Well in exchange for paying its share of the expenses for developing and operating the Well. *See Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co.*, 11 Cal.Rptr.3d 412, 415-16 (Cal. Ct. App. 2004) (explaining a "working interest" is "unlike a royalty interest" and "is burdened with the cost of development and operation of the property") (citation omitted).

[¶7] Chesapeake proceeded with development and its plans to drill horizontally into the Niobrara Formation in January 2012. The Well was completed and producing on June 11, 2012. The distribution of proceeds from the Well, as governed by the UOA and its incorporated provisions, are the source of the parties' dispute.

## A. The Unit Operating Agreement

[¶8] The UOA identifies Chesapeake as the unit operator and defines the duties the company must perform under the agreement. Chesapeake is charged with all operations and is responsible for conducting its activities as a reasonably prudent operator, consulting with parties, and the payment of costs. The UOA also states Chesapeake will comply with "all applicable laws and governmental regulations (whether Federal, State, or local)." As a party to the UOA, Morton has a right of supervision and may call for audits pursuant to the accounting procedures incorporated by reference into the agreement.

[¶9] Article 6 of the UOA addresses "Apportionment of Costs and Ownership and Disposition of Production and Property." With respect to costs, the UOA provides:

> **Costs.** All Costs incurred in the development and operation of a participating area for or in connection with production of unitized substances from any pool or zone for which the participating area is established shall be borne by the Parties within the participating area on an Acreage Basis, determined as of the time the Costs are incurred.

The UOA also incorporates by reference six exhibits, including *Exhibit 1. Accounting Procedure* relevant to this dispute.

2

## B.     The 1985 COPAS Form

[¶10]   The accounting procedure attached to the UOA is a model form prepared by the Council of Petroleum Accountants Societies (COPAS) bearing a copyright from 1985. COPAS is an accounting organization that authors standards, including model accounting procedures, for joint oil and gas operations.  The incorporated accounting procedure (1985 COPAS Form) creates a Joint Account[1] for the parties to share, and which shows the charges paid and credits received associated with operations.  The 1985 COPAS Form requires the operator to bill non-operators (such as Morton) on a regular basis using the Joint Account:

### Statement and Billings

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month.  Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

Paragraph I(4) in the 1985 COPAS Form addresses "Adjustments" to all bills and statements and provides:

### Adjustments

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment.  No adjustment favorable to Operator shall be made unless it is made within the same prescribed period.  The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

---

[1]   Also referred to as "Joint Interest Billing" or "JIB" by the parties and the record.

Paragraph I(4) does not reference other COPAS materials or guidance. However, other sections of the 1985 COPAS Form not relevant to this dispute reference recommended rates or percentages published by COPAS for calculating certain charges.

### C. Chesapeake's Ownership Adjustments

[¶11] The UOA provides the parties will share costs on an "acreage basis." As a result, a party's ownership interest in the Unit dictates its share of the proceeds from the Well. After the Northwest Fetter (Deep) Unit was established but before spudding[2] the Well, Chesapeake assigned Morton a 5.712364% working interest in the Well based on a 440-acre drilling block within the Unit. Some entities elected not to participate in the Unit and based on that new information, Chesapeake revised Morton's working interest up to 6.613912% in February 2012. Once the Well began producing, Chesapeake billed Morton through the Joint Account for its 6.613912% share of the costs and expenses.

[¶12] Chesapeake adjusted Morton's ownership interest again in January 2013 to a 1.244638% working interest. This adjustment was purportedly due to a reduction of the drilling block to 375.365 acres. Nine months later, the Wyoming Oil and Gas Conservation Commission issued an order approving a 375.365-acre drilling and spacing unit for the Well. Because Morton had already paid costs associated with the previous 6.613912% ownership interest, Chesapeake reimbursed Morton $550,750.98 that calendar year for the overpayments.

[¶13] In May 2016, Chesapeake revised Morton's ownership interest again to 1.847326%. The reason for the significant adjustment remains uncertain but the revision coincided with a communitization agreement with the United States Bureau of Land Management resolving federal interests in the Unit containing "374.045 acres, more or less."

[¶14] Finally, in May 2017, Chesapeake readjusted Morton's ownership interest once again from 1.847326% to 6.304085%. The record does not offer a reason why Chesapeake made this final adjustment to Morton's ownership interest.[3]

[¶15] After Chesapeake increased Morton's ownership interest to 6.304085% in May 2017, it invoiced Morton (using the parties' Joint Account) for an increased share of the costs associated with the Well since its inception in 2012. In July 2018, Chesapeake issued

---

[2] "Spudding in" refers to "the first boring of the hole in the drilling of an oil well." *Moncrief v. Louisiana Land and Expl. Co.*, 861 P.2d 516, 522, n. 12 (Wyo. 1993) (citing 8 HOWARD R. WILLIAMS AND CHARLES J. MEYERS, OIL AND GAS LAW 1182 (1991)).

[3] As the district court noted, deposition testimony reveals that when Morton prompted Chesapeake's representatives about the change they responded, "I don't know" or could not provide a clear answer for the ownership adjustment.

a demand for Morton to pay $695,458.41 in outstanding costs associated with the Well based on its final ownership adjustment.

[¶16] Morton objected to Chesapeake's claim for outstanding costs. Morton identified that Paragraph I(4) of the 1985 COPAS Form states "all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed true and correct after twenty-four (24) months following the end of any such calendar year." Thus, Morton took the position that Chesapeake was improperly attempting to collect on invoices beyond the limitation period established in the 1985 COPAS Form.

[¶17] The record does not indicate Chesapeake responded to Morton's objection. However, in July 2020, Chesapeake began suspending revenue payments to Morton in order to recover the outstanding costs it believed Morton owed. This legal challenge ensued.

## D. Legal Proceedings

[¶18] On May 23, 2022, Morton filed an action against Chesapeake. In its Amended Complaint filed on October 14, 2022, Morton asserted claims for: (1) breach of the operating agreement; (2) violation of the WRPA; and (3) conversion. Chesapeake answered and asserted counterclaims for: (1) breach of contract; (2) unjust enrichment; and (3) breach of the implied covenant of good faith and fair dealing. Chesapeake also asserted fourteen affirmative defenses including estoppel and waiver, recoupment or setoff, accord and satisfaction, failure to mitigate damages, and unclean hands.

[¶19] Following discovery, the parties filed cross-motions for summary judgment. While Morton moved for summary judgment on all of its claims, Chesapeake moved for partial summary judgment on its "first counterclaim" for breach of contract against Morton.

[¶20] Chesapeake argued the procedures in the 1985 COPAS Form did not apply to adjustments to Morton's ownership interest. In its briefing, Chesapeake asked the district court to consider COPAS materials issued after the 1985 COPAS Form was published. These extrinsic materials, not incorporated by reference or cited in the parties' agreement, reveal the oil and gas accounting industry revised its practices after publishing the 1985 COPAS Form to address ownership interest adjustments. For example, a 1995 revision to the COPAS model procedures exempted "working interest ownership adjustments" from the "Adjustments" limitation in Paragraph I(4). The 2005 COPAS Form also clarified an adjustment to the working interest ownership or participating interest is allowed beyond the limitations period. Although the parties settled on the 1985 COPAS Form in the UOA, Chesapeake asserted subsequent COPAS amendments supported its construction of Paragraph I(4).

[¶21]   Morton argued the text of Paragraph I(4) is unambiguous and the limitations period applied to all adjustments.  In support of its construction, Morton relied on this Court's decision in *Woods Petroleum Corp. v. Hummel*, 784 P.2d 242 (Wyo. 1989), which found Paragraph I(4) in the same 1985 COPAS Form unambiguous.  Because Morton maintained the plain terms of Paragraph I(4) are clear, it argued it was inappropriate for the district court to consider Chesapeake's extrinsic evidence.

[¶22]   Chesapeake also asserted it did not violate the WRPA because Morton owed Chesapeake (for the outstanding costs and expenses), not the other way around.  Morton argued Chesapeake's decision to withhold proceeds from the Well, regardless of Chesapeake's reasoning, contravened the WRPA.

[¶23]   Morton's opening brief also argued for the dismissal of Chesapeake's counterclaims for unjust enrichment and breach of the implied covenant of good faith and fair dealing.  Chesapeake did not respond to Morton's arguments.  Chesapeake also offered no briefing or argument in support of the affirmative defenses in its Answer.

[¶24]   After the district court held a hearing on the parties' competing motions for summary judgment, it entered a decision and order on September 18, 2023 (Original Order).  There, the district court granted in part and denied in part Morton's motion for summary judgment.  It also denied Chesapeake's motion for partial summary judgment.  Specifically, the district court declined to consider extrinsic evidence and found Chesapeake breached the UOA by invoicing Morton for expenses beyond the twenty-four month limitation period stated in the 1985 COPAS Form.  It also found Chesapeake violated the WRPA when it withheld proceeds from the Well and then presented no evidence that it placed the disputed funds in an escrow account as required by statute.  With respect to Morton's conversion claim, the district court denied summary judgment because questions of fact remained concerning the damages associated with that claim.  Based on its ruling that Chesapeake breached the parties' contract and violated the WRPA, the district court found the company unlawfully retained $401,010.42 in revenue payments due to Morton.

[¶25]   On December 7, 2023, Morton moved to voluntarily dismiss its conversion claim and for entry of a final order.  Morton also asked the district court for clarification on Chesapeake's counterclaims because in its view, the Original Order from September 18, 2023, rendered the counterclaims legally impossible.  Chesapeake did not oppose the dismissal of Morton's conversion claim.  However, Chesapeake argued the district court could not issue a final order because Morton did not seek summary judgment on all fourteen of Chesapeake's affirmative defenses.  Even though Chesapeake did not respond to Morton's previous summary judgment arguments calling for the dismissal of Chesapeake's counterclaims, the company also argued the district court could not issue a final ruling because those counterclaims were not fully presented to the court.

6

[¶26] On March 12, 2024, the district court issued a *Nunc Pro Tunc* order correcting technical errors on the final page of its Original Order. Those errors inadvertently noted Morton breached the UOA and violated the WRPA. The *Nunc Pro Tunc* order clarified Chesapeake breached the agreement and violated the WRPA.

[¶27] The district court then issued a supplemental decision and order on March 13, 2024, (Supplemental Order) granting Morton's motion to voluntarily dismiss its conversion claim. Finding its Original Order dispensed with Chesapeake's counterclaims, the district court entered a final judgment for Morton. The district court also found Chesapeake's affirmative defenses, not raised during summary judgment briefing, were rendered moot.

[¶28] Chesapeake timely appealed and challenges the district court's Original Order from September 18, 2023, finding the company breached the UOA and violated the WRPA. Chesapeake also challenges the procedural and substantive basis for the district court's Supplemental Order issued on March 13, 2024.

## STANDARD OF REVIEW

[¶29] Wyoming Rule of Civil Procedure 56 governs summary judgment and imposes obligations on the movant and nonmovant. *Kaufman v. Rural Health Dev., Inc.*, 2019 WY 62, ¶ 14, 442 P.3d 303, 307 (Wyo. 2019). Summary judgment is appropriate when no genuine issue as to any material fact exists and when the prevailing party is entitled to judgment as a matter of law. *Comet Energy Servs., LLC v. Powder River Oil & Gas Ventures, LLC*, 2008 WY 69, ¶ 5, 185 P.3d 1259, 1261 (Wyo. 2008) (citation omitted); *see also* W.R.C.P. 56(c). We evaluate the propriety of summary judgment by employing the same standards and using the same materials as the lower court employed and used. *Id.* We do not accord deference to the district court's decisions on issues of law. *Id.* "The court considers the record from the viewpoint most favorable to the party opposing the motion, giving all favorable inferences to be drawn from the facts contained in affidavits, depositions and other proper material appearing in the record to the opposing party." *Ultra Res., Inc. v. Hartman*, 2010 WY 36, ¶ 20, 226 P.3d 889, 905 (Wyo. 2010) (quoting *Powder River Oil Co. v. Powder River Petroleum Corp.,* 830 P.2d 403, 406–07 (Wyo. 1992)). In cases requiring the interpretation of a contract, summary judgment is appropriate only if the contract is clear and unambiguous. *Comet Energy Servs., LLC*, ¶ 5, 185 P.3d at 1261 (citations omitted).

[¶30] "[T]he central purpose of Rule 60(a) is to effectuate the contemporaneous intent of the court and to ensure that the judgment reflects that intent." *Van Vlack v. Van Vlack*, 2024 WY 130, ¶ 19, 560 P.3d 268, 275 (Wyo. 2024) (citing *Spomer v. Spomer*, 580 P.2d 1146, 1149 (Wyo. 1978)). We conduct a two-part review of a district court's application of W.R.C.P. 60(a). *Id.* (citing *Snyder v. Snyder*, 2021 WY 101, ¶ 13, 495 P.3d 876, 879 (Wyo. 2021)). First, the court considers whether the requested correction or clarification relates to a "clerical mistake." *Id.*; *see also* W.R.C.P. 60(a). Second, the court determines

whether the proposed correction or clarification modifies the original judgment. *Id*. Both parts of the analysis raise questions of law, which we review de novo. *Id.*

## *DISCUSSION*

## I.    Chesapeake breached its contract with Morton.

[¶31]   Chesapeake argues the UOA expressly provides for ownership adjustments and the plain language of the UOA does not limit when the operator can modify a cost determination.  According to Chesapeake, ownership adjustments are a function of the UOA and not the procedures outlined in the 1985 COPAS Form.  Chesapeake also contends the incorporated 1985 COPAS Form is silent on ownership adjustments and extrinsic evidence demonstrates the model language does not apply to ownership adjustments.  As a result, the company argues the district court erred when it found the 1985 COPAS Form governed Chesapeake's adjustment to the ownership interest.   In the alternative, Chesapeake argues that even if the 1985 COPAS Form does apply, its ownership adjustment was not to "any bills or statements."

[¶32]   Our review of any contract begins with the document's plain language. *Claman v. Popp*, 2012 WY 92, ¶ 26, 279 P.3d 1003, 1013 (Wyo. 2012) (citing *Hunter v. Reece*, 2011 WY 97 ¶ 17, 253 P.3d 497, 501-02 (Wyo. 2011)).  We have stated:

> [T]he words used in the contract are afforded the plain meaning that a reasonable person would give to them. *Doctors' Co. v. Insurance Corp. of America,* 864 P.2d 1018, 1023 (Wyo. 1993).   When the provisions in the contract are clear and unambiguous, the court looks only to the "four corners" of the document in arriving at the intent of the parties. *Union Pacific Resources Co.* [*v. Texaco*], 882 P.2d [212,] 220 [(Wyo. 1994)]; *Prudential Preferred Properties* [*v. J and J Ventures*], 859 P.2d [1267,] 1271 [(Wyo. 1993)].   In the absence of any ambiguity, the contract will be enforced according to its terms because no construction is appropriate. *Sinclair Oil Corp. v. Republic Ins. Co.*, 929 P.2d 535, 539 (Wyo. 1996).

*Bear Peak Res., LLC v. Peak Powder River Res., LLC*, 2017 WY 124, ¶ 12, 403 P.3d 1033, 1040-41 (Wyo. 2017) (quoting *Thornock v. PacificCorp.*, 2016 WY 93, ¶ 13, 379 P.3d 175, 180 (Wyo. 2016)) (brackets in original).  Courts will only turn to extrinsic evidence and rules of contract construction if a contract is ambiguous and its meaning is doubtful or uncertain. *Wolter v. Equitable Res. Energy Co., W. Region*, 979 P.2d 948, 952 (Wyo. 1999).

8

### A.     Under the UOA, costs are determined "as of the time" they are incurred.

[¶33]  Chesapeake asserts Section 6.1.A. of the UOA expressly speaks to ownership adjustments and does not impose any time limit or conditions on ownership changes in the Northwest Fetter (Deep) Unit.  Section 6.1.A. provides:

> **Costs.** All Costs incurred in the development and operation of a participating area for or in connection with production of unitized substances from any pool or zone for which the participating area is established shall be borne by the Parties within the participating area on an Acreage Basis, determined as of the time the Costs are incurred.

Section 6.1.A. addresses the allocation of "All Costs" associated with the Northwest Fetter (Deep) Unit and assigns those costs on the basis of acreage.  However, in this text, we fail to see Chesapeake's claim that the UOA does not include any timing considerations.

[¶34]  "We interpret contracts as a whole, reading each provision in light of all the others to find the plain and ordinary meaning of the words." *Arnold v. Ommen*, 2009 WY 24, ¶ 40, 201 P.3d 1127, 1138 (Wyo. 2009).  "The 'language of the parties expressed in their contract must be given effect in accordance with the meaning which that language would convey to reasonable persons at the time and place of its use.'" *Larson v. Burton Constr., Inc.*, 2018 WY 74, ¶ 16, 421 P.3d 538, 544 (Wyo. 2018) (quoting *Ultra Res., Inc. v. Hartman*, 2010 WY 36, ¶ 22, 226 P.3d 889, 905 (Wyo. 2010)).

[¶35]  Section 6.1.A. specifically states costs are "determined as of the time the Costs are incurred."  Chesapeake does not assert Section 6.1.A is ambiguous.  Finding no ambiguity in the UOA, we look to the plain meaning of its terms.  *See Bowers Oil and Gas, Inc. v. DCP Douglas, LLC*, 2012 WY 103, ¶ 22, 281 P.3d 734, 742 (Wyo. 2012) (considering the plain meaning of the terms after finding the contract was clear and unambiguous).  The term "as of" is a preposition defined to mean "On, At, From — used to indicate a time or date at which something begins or ends." *Merriam-Webster's Collegiate Dictionary* 68 (10th Ed. 1999); *see also Webster's Third New International Dictionary* 129 (2002) (defining "as of" to mean "at or on (a specific time or date)").

[¶36]  Chesapeake's argument overlooks the language in the UOA which provides costs are "determined as of the time the Costs are incurred."  The parties' use of the term "as of" in conjunction with the phrase "the time the Costs are incurred" is expressly contemporaneous, and Section 6.1.A. means what it says — costs are determined when the costs are incurred.  Giving every word effect in the UOA, we disagree with Chesapeake's argument that Section 6.1.A. is devoid of any time limits or constraints on modifications.

## B. Paragraph I(4) of the 1985 COPAS Form is unambiguous.

[¶37]   Section 2 of the UOA incorporates by reference the 1985 COPAS Form because the UOA expressly refers to the document and demonstrates in specific terms the parties' intent to incorporate the COPAS language into the contract.  *See Pennaco Energy, Inc. v. KD Co., LLC*, 363 P.3d 18, 38 (Wyo. 2015) (stating "[u]nder general contract principles, when a contract expressly refers to and incorporates another instrument in specific terms which show a clear intent to incorporate that instrument into the contract, both instruments are to be construed together.")  Accordingly, we construe the two documents together.  *See id.*

[¶38]   Chesapeake argues Paragraph I(4) of the 1985 COPAS Form is ambiguous because it is silent on ownership adjustments.  Because it believes the 1985 COPAS Form is ambiguous, Chesapeake asks this Court to consider extrinsic evidence.

[¶39]   "Ambiguity is present where a contract term 'is obscure in its meaning because of indefiniteness of expression or because it contains a double meaning.'"  *Comet Energy*, ¶ 11, 185 P.3d at 1263 (quoting *Ferguson v. Reed*, 822 P.2d 1287, 1289 (Wyo. 1991)).  "Ambiguity is not created, however, by the parties' subsequent disagreement over the meaning of the contract."  *Id.*, ¶ 11, 185 P.3d at 1263 (citations omitted); *see also Moncrief v. Louisiana Land and Expl. Co.,* 861 P.2d 516, 524 (Wyo. 1993) (recognizing the "parties' subsequent disagreement concerning the contract's meaning does not establish an ambiguity which would require resort to extrinsic evidence.").

[¶40]   We begin with the language of the 1985 COPAS Form.  *See Wolter*, 979 P.2d at 951 (recognizing "[the Court's] initial inquiry centers on whether the language of the contract is clear or ambiguous.").  Paragraph I(4), provides:

> **Adjustments**
>
> Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment.  No adjustment favorable to Operator shall be made unless it is made within the same prescribed period.  The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

10

Paragraph I(4) is entitled "Adjustments" and its text uses comprehensive language including "any" such bills and "all" bills and statements rendered. *See Merriam-Webster's Collegiate Dictionary* 29, 52 (10th Ed. 1999) (defining "all" as "Every" and "any" as "Every – used to indicate one selected without restriction"). Specifically, the 1985 COPAS Form states "all bills and statements rendered to Non-operators by Operator during any calendar year shall conclusively be presumed to be true and correct" after the twenty-four month period following the end of any such calendar year. Paragraph I(4) then excludes adjustments "resulting from a physical inventory of Controllable Material."

[¶41]   Chesapeake does not contend Paragraph I(4) contains any terms which present two different, yet viable, interpretations of the 1985 COPAS Form. Instead, Chesapeake maintains Paragraph I(4) does not speak to adjustments due to an ownership change.[4] We disagree.

[¶42]   Chesapeake relies on *Sheridan Fire Fighters Local No. 276 v. City of Sheridan*, to support its argument that silence in the 1985 COPAS Form creates ambiguity. 2013 WY 36, 303 P.3d 1110 (Wyo. 2013). In *Sheridan Fire Fighters*, the collective bargaining agreement included a grade and step system that established pay grades but did not explain how an employee would move up a step. *Id.*, ¶ 12, 303 P.3d at 1115. This Court first considered all the pertinent language in the agreement and considered whether the text included "a plain or obvious expression" of the parties' intent. *Id.*, ¶ 16, 303 P.3d at 1115. The Court then considered whether the party invoking the silence presented a plausible alternative interpretation. *Id.,* ¶ 19, 303 P.3d at 1116. Importantly, the Court's reasoning in finding that agreement was ambiguous relied on the local union's ability to demonstrate how the text, combined with the subsequent silence on how pay raises were issued, was "susceptible to more than one plausible interpretation." *Id.*

[¶43]   Aside from claiming the language in Paragraph I(4) is silent as to ownership adjustments, Chesapeake does not fully explain how the text of the 1985 COPAS Form is susceptible to more than one plausible interpretation. The thrust of Chesapeake's argument draws upon extrinsic evidence — specifically, COPAS guidance developed after the 1985 COPAS Form was developed — to formulate ambiguity. This Court, however, has made clear that courts cannot consider extrinsic evidence to establish an ambiguity.

> The ambiguity which justifies examining extrinsic evidence must exist . . . in the language of the document itself. It cannot be found in subsequent events or conduct of the parties, matters which are extrinsic evidence. The suggestion that one should examine extrinsic evidence to determine whether extrinsic evidence may be examined is circuitous.

---

[4] Chesapeake also claims Morton does not dispute the 1985 COPAS Form is silent on working interest adjustments. Our review of Chesapeake's citations to the record reveals Morton made no such concession.

*Wolter*, 979 P.2d at 952 (citing *State v. Pennzoil Co.*, 752 P.2d 975, 978 (Wyo. 1988)). We find no error in the district court's adherence to the four corners of the UOA and 1985 COPAS Form in its analysis.

[¶44] Much like our reasoning in *Gumpel v. Copperleaf Homeowners Ass'n*, the plain language of Paragraph I(4) does not treat ownership interest adjustments differently than the adjustments covered by the 1985 COPAS Form. ¶¶ 40-41, 393 P.3d 1279, 1293 (Wyo. 2017) (rejecting argument that the covenants were silent on the rights of adjoining homeowners). Chesapeake's effort to draw on "silence" in Paragraph I(4) is really asking this Court to supply an exception that was not written into the 1985 COPAS Form or the UOA. And, as in *Gumpel*, we reiterated "[i]t is not the function of this Court or any court to write terms into a contract." *Id.*, ¶ 42, 393 P.3d at 1293.

[¶45] The 1985 COPAS Form clearly addresses "Adjustments" and uses inclusive terms like "any" and "all" to describe the bills, and "all" to describe the statements, subject to the Joint Account and twenty-four month limitation. It also creates only one exception for a category of adjustments not relevant to this appeal. This language does not convey any double or obscure meanings. Therefore, we find Paragraph I(4) is unambiguous.[5] *See Treemont, Inc. v. Hawley*, 886 P.2d 589, 592 (Wyo. 1994) (finding a contract unambiguous because the language was plain and the obligations of the parties were specifically stated).

[¶46] It remains well-established that "[w]e turn to extrinsic evidence and rules of contract construction only when the contract language is ambiguous and its meaning is doubtful or uncertain." *Davison v. Wyo. Game & Fish Comm'n*, 2010 WY 121, ¶ 27, 238 P.3d 556, 565 (Wyo. 2010) (citation omitted). Because Paragraph I(4) is unambiguous, it is not appropriate to use extrinsic evidence to examine the language in the 1985 COPAS Form.

### C. Extrinsic evidence is not necessary to evaluate a specialized meaning.

[¶47] Alternatively, Chesapeake argues even if the language in the 1985 COPAS Form is unambiguous, this Court has other reasons for considering extrinsic evidence. It contends COPAS guidance documents are relevant to understanding the terms in Paragraph I(4) and the context of the parties' agreement.

[¶48] "The circumstances whereby extrinsic evidence is relevant are limited." *Phoenix Capital Grp. Holdings, LLC v. Woods*, 2024 WY 104, ¶ 17, 556 P.3d 1148, 1154 (Wyo. 2024) (citations omitted). We have said "Courts should consider the circumstances surrounding the execution of the agreement to determine the parties' intention, even in

---

[5] At least one other jurisdiction has examined the same "Adjustments" language in the COPAS Procedure and found the language unambiguous. *See Grynberg v. Dome Petroleum Corp.*, 1999 ND 167, ¶¶ 17-18, 599 N.W.2d 261, 266-67 (N.D. 1999).

reviewing unambiguous contracts" but recognize "[t]his rule of contract interpretation is used only in situations where an otherwise unambiguous term had a different, special, or technical usage at the time the contract was executed." *Thornock*, ¶ 19, 379 P.3d at 181 (discussing *Ultra Res., Inc. v. Hartman*, 2010 WY 36, ¶ 22, 226 P.3d 889, 905 (Wyo. 2010)) (citations omitted). Moreover, extrinsic evidence of context "cannot be invoked to contradict the clear meaning of the language used, . . . extraneous circumstances do not justify a court in proceeding to insert therein a provision other than or different from that which the language used clearly indicates, and thereby, in effect, make a contract for the parties." *Phoenix Capital*, ¶ 17, 556 P.3d at 1154 (citing *Upper Wagon Box, LLC v. Box Hanging Three Ranch Ltd. P'ship*, 2022 WY 155, ¶ 23, 521 P.3d 551, 560 (Wyo. 2022)).

[¶49] Chesapeake cites *Jonah Energy, LLC v. Wyoming Department of Revenue*, for the proposition that this Court can consider extrinsic evidence regarding specialized meanings or industry trade usage. 2023 WY 87, 534 P.3d 902 (Wyo. 2023). But Chesapeake's reliance on *Jonah Energy* is misplaced because there we rejected an effort to draw upon extrinsic evidence where the party did not identify any contract terms that held a "different, special, or technical meaning." *Id.*, ¶ 33, 534 P.3d at 912-13. Here, Chesapeake contends "the language used by COPAS in the COPAS Procedure is undoubtedly trade usage in the realm of oil and gas accountants" but analogously does not isolate any particular terms or phrases in Paragraph I(4) which are special or technical in nature.

[¶50] The four corners of the 1985 COPAS Form reveal another reason why this Court need not consider extrinsic COPAS guidance when reviewing Paragraph I(4). *See Fremont Homes, Inc. v. Elmer*, 974 P.2d 952, 956 (Wyo. 1999) (stating "[w]e consider the contract as a whole, reading each part in light of all other parts; meaning should be afforded to all the language used by the parties if that can be done and a reasonable construction achieved."). In other sections of the incorporated 1985 COPAS Form, the document expressly references extrinsic COPAS materials, including Paragraphs II(4), II(6)(C), III(1)(3), and IV(2)(E). Paragraph III(1)(3) even edits the 1985 COPAS Form by striking a portion of the model language regarding overhead and inserting language stating certain rates shall be adjusted "by the percent increase or decrease published by COPAS." Despite the parties' express attention to extrinsic COPAS materials in other provisions of the 1985 COPAS Form, Paragraph I(4) contains no reference to COPAS guidance.

[¶51] When read in context with other language in the agreement, Paragraph I(4) does not lend itself to considering extrinsic materials for clarification of any terms or conditions. Chesapeake also has not demonstrated any of the terms at issue are uniquely specialized. *See, e.g., Jonah Energy*, ¶ 33, 534 P.3d at 912-13. Therefore, we decline to consider extrinsic materials to review the unambiguous language in Paragraph I(4).

13

## D. Chesapeake's ownership adjustment was an adjustment outside the twenty-four month period.

[¶52]  Chesapeake maintains that even if Paragraph I(4) is unambiguous, the district court erred in finding the company adjusted bills and statements outside the twenty-four month period.  Specifically, Chesapeake argues it did not adjust "bills and statements" but merely charged some working interest owners more by sending updated statements to the Joint Account.

[¶53]  "Courts look at the plain meaning of the words employed in a clear and unambiguous contract to determine the parties' intent." *Wolter*, 979 P.2d at 951.  The term "adjustment" means "a settlement of a claim or debt in a case in which the amount involved is uncertain or full payment is not made." *Merriam-Webster's Collegiate Dictionary* 15 (10th Ed. 1999).  This definition is almost identical to the one we relied on when this Court reviewed the same COPAS language on a different occasion.  *See Woods*, 784 P.2d at 243-44 (defining "adjustment" as "a settlement of a claim or debt in a case in which the amount involved is uncertain or in which full payment is not made.") (citing *Webster's Third New International Dictionary* 27 (1961)).

[¶54]  Chesapeake's argument that its ownership adjustment, in and of itself, was not an adjustment limited by Paragraph I(4) might have more salience if the company had not relied on the procedures established in the 1985 COPAS Form to then invoice Morton for a greater share of previously settled bills and statements.  After Chesapeake adjusted Morton's ownership interest in 2017, it submitted a bill labeled "Operator Invoice — JIB" to the parties' Joint Account using the process created by the 1985 COPAS Form.  Chesapeake's invoice to the Joint Account attempted to recover a greater share from "bills and statements" dating back to 2013 and falls within the plain meaning of the "Adjustments" clause because the company sought to settle claims or debts beyond the limitation period.

[¶55]  Chesapeake's construction of the 1985 COPAS Form is not reasonable in light of the broad "all bills and statements" language in Paragraph I(4) or its express direction that such bills "shall conclusively be presumed to be true and correct" beyond the twenty-four-month period.  *See Bear Peak*, ¶ 19, 403 P.3d at 1042 (rejecting a parties' interpretation of a contract where it would render its terms meaningless).  Even if Chesapeake's ownership adjustment had not substantively disturbed its previously submitted bills and statements, its invoice demanding Morton pay a greater share from those bills sought to settle a claim or debt outside the twenty-four month window provided in the 1985 COPAS Form.  Therefore, we find Chesapeake impermissibly adjusted bills and statements beyond the limitations period.[6]

---

[6] Chesapeake also argues the district court erred because its ownership adjustments were not favorable to the operator.  We find Chesapeake's argument unavailing because the company's entire litigation position

14

[¶56] The district court's order followed a similar line of reasoning in finding Chesapeake's ownership adjustment was an adjustment under Paragraph I(4). It considered the invoice sent to the Joint Account and explained Chesapeake's "'change in ownership' with an accompanying invoice is factually similar to *Woods* [*Petroleum Corp.*] *v. Hummel* insofar as Chesapeak[e] attempts to recoup additional operating expenses from the non-operator beyond the twenty-four (24) month limitation period explicitly described in the controlling contract." As it turns out, the district court's reliance on *Woods Petroleum* was unnecessary to determining whether the ownership adjustment fell under Paragraph I(4), for the reasons described above. *See Sky Harbor Air Serv., Inc. v. Cheyenne Regional Airport Bd.*, 2016 WY 17, ¶ 40, 368 P.3d 264, 272-73 (Wyo. 2016) (stating "[w]e can affirm an order granting summary judgment on any basis appearing in the record.") (citing *Magin v. Solitude Homeowner's Inc.*, 2011 WY 102, ¶ 20, 255 P.3d 920, 927 (Wyo. 2011)). We find no error in the district court's conclusion that Chesapeake's ownership adjustment was an adjustment pursuant to Paragraph I(4) that breached its contract with Morton.

## II.     The District Court properly issued its Supplemental Order.

[¶57] Chesapeake also challenges the district court's Supplemental Order dismissing its counterclaims against Morton. First, Chesapeake argues the district court improperly relied on Rule 60(a). Second, it contends the Supplemental Order improperly awarded Morton summary judgment on Chesapeake's counterclaims for unjust enrichment and breach of an implied covenant of good faith and fair dealing. Third, Chesapeake maintains the district court did not properly dispense with its affirmative defenses.

### A.     The district court's Supplemental Order complied with Rule 60(a).

[¶58] After the district court issued its Original Order on the parties' cross-motions for summary judgment, Morton moved to voluntarily dismiss its conversion claim and asked the district court to enter a final order "clarifying that the SJ Order necessarily resolved all of Chesapeake's counterclaims." The parties submitted additional briefing and the district court entered the Supplemental Order on March 13, 2024, which relied on Rule 60(a). Chesapeake argues Rule 60(a) was an improper basis for the Supplemental Order because the district court did not correct or clarify a clerical error.

[¶59] "Rule 60(a) is intended to correct clerical errors rather than mistakes made by the court (judicial errors)." *Meckem v. Carter*, 2014 WY 52, ¶ 12, 323 P.3d 637, 643 (Wyo. 2014) (citing *Elsasser v. Elsasser*, 989 P.2d 106, 108 (Wyo. 1999)). "A clerical error is a

---

rests on the theory that the company was forced to incur additional costs for the Well and its "reallocation of costs and expenses" would have allowed Chesapeake to offset those additional costs from Morton.

15

mistake or omission of a mechanical nature apparent on the face of the record that prevents the judgment as entered from accurately reflecting the judgment that was rendered." *Id.*

[¶60] Chesapeake asserts the district court's Supplemental Order did not fix a clerical error. This Court has examined the distinction between a judicial and clerical error on several occasions. *See, e.g., Holmes v. Holmes*, 211 P.2d 946, 335-36 (Wyo. 1949); *Matter of Kimball's Estate*, 583 P.2d 1274, 1277-78 (Wyo. 1978); *Spomer v. Spomer*, 580 P.2d 1146, 1149 (Wyo. 1978); *Eddy v. First Wyoming Bank N.A.-Lander*, 713 P.2d 228 (Wyo. 1986); *see also In re Kite Ranch, LLC v. Powell Family of Yakima, LLC*, 2008 WY 39, ¶ 18, 181 P.3d 920, 925-26 (Wyo. 2008). And we have stated:

> A clerical error is not dependent upon its sources but may be made by the judge of the court himself . . . . [and] "all errors, mistakes, or omissions which are not the result of the exercise of the judicial function" may be called clerical errors while a judicial error is one which is "the deliberate result of judicial reasoning and determination[.]"

*Matter of Kimball's Estate*, 583 P.2d at 1277-78 (quoting *Holmes*, 211 P.2d at 336).

[¶61] In its Supplemental Order, the district court explained its Original Order omitted resolution of Morton's request for summary judgment on Chesapeake's counterclaims. The omission arose from the fact that the district court's Original Order granting judgment in favor of Morton's breach of contract claim rendered Chesapeake's counterclaims a legal impossibility. Accordingly, the district court found "it necessary and appropriate" to issue the Supplemental Order pursuant to Rule 60(a).

[¶62] Despite Chesapeake's position that the omission was a judicial mistake simply because it arose from the district court's Original Order, our precedent explains the distinction between clerical and judicial errors "does not depend so much upon the person making the error." *Holmes,* 211 P.2d at 953. This Court has also stated a judicial omission, "if not deliberate, may well be regarded as a clerical error." *Id.* at 954. Chesapeake does not contend the district court's omission was deliberate, and our review of the record does not suggest the omission was anything but a mistake. Therefore, we find the clarification in the Supplemental Order corrected a clerical mistake.

[¶63] The Supplemental Order also did not improperly modify the Original Order. "W.R.C.P. 60(a) can only be used to make the judgment or record speak the truth and not to make it say something other than what was originally pronounced." *Snyder*, ¶ 16, 495 P.3d at 879-80 (internal quotation marks omitted). Therefore, any clarification that substantively alters the order violates the purpose of the rule. *Id.*

[¶64] Chesapeake argues the district court abused its discretion because it expanded its previous summary judgment ruling. We start by comparing the district court's Original Order with the Supplemental Order. *Glover v. Crayk*, 2005 WY 143, ¶ 10, 122 P.3d 955, 958 (Wyo. 2005). The district court's Original Order found Chesapeake breached the parties' agreement and granted summary judgment in favor of Morton.[7] The Supplemental Order also found "its *Decision and Order on Summary Judgment* effectively disposed of Chesapeake's counterclaims" and granted Morton summary judgment on Chesapeake's claims for unjust enrichment and breach of the covenant of good faith and fair dealing.

[¶65] The district court did not abuse its discretion because the omission in the Original Order prevented that order from reflecting the district court's intent when it granted Morton summary judgment in the first instance. *See Elsasser*, 989 P.2d at 109 (affirming amended order under Rule 60(a) because the correction "facilitates the intent expressed" in the original judgment). The Supplemental Order was necessary to address the ambiguity which stemmed from the district court's inadvertent omission. We previously affirmed the use of Rule 60(a) under a similar circumstance. *See R.C.R., Inc. v. Rainbow Canyon, Inc.*, 978 P.2d 581, 589-90 (Wyo. 1999) (affirming an amended judgment under Rule 60(a) which resolved an ambiguity created by the district court's unintentional omission). The district court's omission was not deliberate and it did not improperly modify the judgment when it entered the Supplemental Order.

[¶66] Finally, Chesapeake takes exception to the fact that Morton did not move the district court to issue its clarification under Rule 60(a). However, "[a] district court enjoys considerable latitude in determining the procedural scheme it will follow in reaching its determinations, and we will not reverse such procedural decisions absent an abuse of discretion." *Simek v. Tate*, 2010 WY 65, ¶ 12, 231 P.3d 891, 896 (Wyo. 2010). Rule 60(a) permits courts to issue a corrective order "on motion or on its own" and here, both parties briefed Morton's motion for clarity. W.R.C.P. 60(a); *see also Union Pac. R. Co. v. Caballo Coal Co.*, 2011 WY 24, ¶ 32, 246 P.3d 867, 875 (Wyo. 2011) (discussing instances where this Court found an abuse of discretion when the parties were denied due process protections afforded by the applicable rules of civil procedure).

[¶67] Relatedly, Rule 56 does not foreclose a district court from issuing a supplemental summary judgment order. *See* W.R.C.P. 56. There are instances where a district court may need to dispense with outstanding issues with a subsequent order. *See, e.g., Lawrence v. City of Rawlins*, 2010 WY 7, ¶¶ 9-10, 224 P.3d 862, 866 (Wyo. 2010) (district court entering a second summary judgment order after granting partial summary judgment); *Gumpel*, ¶¶ 19-23, 393 P.3d at 1288-89 (Wyo. 2017) (district court entering a supplemental

---

[7] As previously explained, the analysis in the district court's Original Order concluded Chesapeake breached the UOA but its order mistakenly transposed the names of the parties, stating Morton breached the UOA. The district court then issued a *Nunc Pro Tunc* Order on March 12, 2024, correcting the error by noting Chesapeake was the breaching party.

17

summary judgment order after a first round of summary judgment orders).  The district court did not abuse its discretion when it issued the Supplemental Order.

**B.    The District Court properly granted Morton judgment on Chesapeake's abandoned counterclaims.**

[¶68]  Chesapeake contends it did not receive an opportunity to defend its counterclaims and argues the Supplemental Order did not comply with the standards of Rule 56.

[¶69]  Rule 56 governs summary judgment and imposes obligations on the movant and nonmovant.  *Kaufman*, ¶ 14, 442 P.3d at 307 ("The party requesting summary judgment bears the initial burden of establishing a prima facie case that no genuine issue of material fact exists and that summary judgment should be granted as a matter of law.").  "Until the movant has made a prima facie showing that there are no genuine issues of material fact, the nonmovant has no obligation to respond to the motion with materials beyond the pleadings."  *Id.*  "Once a prima facie showing is made, the burden shifts to the party opposing the motion to present specific facts showing that a genuine issue of material fact does exist."  *Boehm v. Cody Country Chamber of Commerce*, 748 P.2d 704, 710 (Wyo. 1987) (citing *England v. Simmons*, 728 P.2d 1137, 1140-41 (Wyo. 1986)).

[¶70] Morton's opening summary judgment brief argued for the dismissal of Chesapeake's counterclaims unjust enrichment and breach of implied covenant of good faith and fair dealing.  Its argument was supported by the fact that the parties were governed by the UOA and Morton was complying with the plain and unambiguous terms of the agreement.  Chesapeake did not respond to Morton's arguments in its responsive brief and did not invoke its counterclaims in its opening brief in support of its partial motion for summary judgment.  Chesapeake, however, acknowledged there was no dispute the parties are subject to a valid contract.  During argument before the district court, Chesapeake's counsel also did not address Morton's argument seeking dismissal of the company's counterclaims.

[¶71] Although its argument was only two paragraphs, Morton made a prima facie showing it was entitled to summary judgment on Chesapeake's counterclaims.  *See Bear Peak Res.*, ¶ 27, 403 P.3d 1033 at 1044 (defining "prima facie case" as "[a] party's production of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor.").  Morton raised the undisputed fact that the parties' conduct was governed by the terms of the contract and cited the relevant legal authorities which precluded Chesapeake from prevailing on its counterclaims.  The burden was then on Chesapeake to respond with evidence showing genuine issues of material fact remained as to its counterclaims.  *See Boehm*, 748 F.2d at 710.  Chesapeake made no effort to meet its obligation under Rule 56 until after the district court entered the Original Order.

[¶72]  Rule 56 "clearly contemplates a motion and full adversary proceedings before a summary judgment is granted." *Basic Energy Servs., L.P. v. Petroleum Res. Mgmt., Corp.*, 2015 WY 22, ¶ 20, 343 P.3d 783, 789 (Wyo. 2015) (quoting *Union Pacific R.R. Co. v. Caballo Coal Co.*, 2011 WY 24, ¶ 31, 246 P.3d 867, 875 (Wyo. 2011)).  But, as a general rule, a party's failure to oppose a particular basis for summary judgment constitutes a waiver of that argument.  73 Am. Jur. 2d, Summary Judgment § 25 (2024).  Thus, when the non-moving party fails to respond, the district court examines the moving party's submission to determine if it has demonstrated it is entitled to judgment as a matter of law.  *Reed v. Bennett,* 312 F.3d 1190, 1194-95 (10th Cir. 2014).  If the moving party has met its burden, summary judgment is appropriate.

[¶73]  Chesapeake had several opportunities during the summary judgment phase to respond to Morton's arguments.  This is not a scenario where the district court denied Chesapeake due process by entering judgment without hearing from both parties.  *See Union Pac. R. Co.,* ¶ 32, 246 P.3d at 875 (discussing instances where district courts abused their discretion by denying due process protections afforded by the applicable rules of civil procedure).  We find the district court afforded Chesapeake a proper opportunity to oppose summary judgment on its counterclaims and, when Chesapeake failed to do so, the district court properly granted summary judgment in Morton's favor.

[¶74]  Chesapeake also argues the Supplemental Order lacks any basis in law or fact.  Specifically, it contends the district court erred in addressing Chesapeake's counterclaim for breach of the covenant of good faith and fair dealing.  Although Chesapeake did not advance any arguments related to its counterclaim until after summary judgment briefing concluded, the district court still considered Chesapeake's untimely arguments.

[¶75]  We define the implied covenant of good faith and fair dealing as follows:

> The implied covenant of good faith and fair dealing requires that neither party commit an act that would injure the rights of the other party to receive the benefit of their agreement.  Compliance with the obligation to perform a contract in good faith requires that a party's actions be consistent with the agreed common purpose and justified expectations of the other party.  A breach of the covenant of good faith and fair dealing occurs when a party interferes or fails to cooperate in the other party's performance.

*Scherer Const., LLC v. Hedquist Const., Inc.*, 2001 WY 23, ¶ 19, 18 P.3d 645, 653 (Wyo. 2001) (internal citations omitted).

[¶76]  The district court applied this same rule of law in the Supplemental Order.  It considered Chesapeake's allegation that Morton was aware of its ownership interest when

the UOA was executed in 2010 and accepted a refund from Chesapeake after the company revised the unit ownership interests in 2012 and 2013. The district court then considered the parties' previously filed affidavits showing Morton faithfully paid its proportionate share of expenses until Chesapeake sought to recoup amounts it claimed Morton underpaid beyond the twenty-four month limitation in the parties' agreement.

[¶77] In the Supplemental Order, the district court concluded Morton was entitled to summary judgment on Chesapeake's counterclaim for breach of implied covenant of good faith and fair dealing because: (1) the district court's Original Order found Morton rightfully refused to "refund" Chesapeake for costs outside the contractual limitation period; and (2) the evidence presented by the parties did not show Morton participated in self-dealing or breached community standards when it acted consistently with the terms of the UOA.

[¶78] Our review of the record does not suggest Morton acted unreasonably in response to Chesapeake's untimely demand for a refund. *See Scherer Const., LLC*, ¶ 19, 18 P.3d at 653-54 (stating "[i]n the absence of evidence of self-dealing or breach of 'community standards of decency, fairness or reasonableness,' the exercise of contractual rights alone will not be considered a breach of the covenant.") (internal quotation and citation omitted). We find the Supplemental Order was supported by the record and the district court did not err as a matter of law.

## C. Chesapeake waived its affirmative defenses.

[¶79] Chesapeake argues it was improper for the district court to grant Morton summary judgment because Morton did not move for summary judgment on Chesapeake's affirmative defenses.

[¶80] Affirmative defenses "attempt to defeat the cause of action." *Matter of Phyllis V. McDill Revocable Trust*, 2020 WY 99, ¶ 14, 468 P.3d 694, 699 (Wyo. 2020). It is "well established in Wyoming jurisprudence that the burden of proof is on the party who asserts the affirmative of any issue." *In re Walsh*, 2004 WY 96, ¶ 19, 96 P.3d 1, 7-8 (Wyo. 2004) (citing *Osborn v. Manning*, 685 P.2d 1121, 1124 (Wyo. 1984)). Affirmative defenses are no different. The burden of proof is on the party asserting an affirmative defense. *First Nat. Bank of Morrill v. Ford*, 216 P. 691, 697 (Wyo. 1923) (stating "an affirmative defense must be proved by the defendant"); *Younglove v. Graham and Hill*, 526 P.2d 689, 693 (Wyo. 1974) (stating "the burden of proof is upon the one asserting an affirmative defense); *see also Gonzales v. Pers. Collection Serv.*, 494 P.2d 201, 207 (Wyo. 1972) (same). Accordingly, an affirmative defense "must be pleaded and raised in the lower court." *Texas Gulf Sulphur Co. v. Robles*, 511 P.2d 963, 965 (Wyo. 1973).

[¶81] Chesapeake pled fourteen affirmative defenses in its Answer to Morton's first Amended Complaint. But Chesapeake did not raise any of its affirmative defenses during

20

summary judgment. Instead, it apparently proceeded under the mistaken belief that Morton had the obligation to move for summary judgment on Chesapeake's affirmative defenses.[8]

[¶82] Having pled affirmative defenses, Chesapeake carried the burden of asserting those affirmative defenses. *Younglove*, 526 P.2d at 693. The failure to assert an affirmative defense, by motion or in an opening summary judgment brief constitutes waiver. *Texas Gulf Sulphur Co.*, 511 P.2d at 965 (stating "[t]he failure to raise [an affirmative] defense was a waiver and results in its removal from the case, and further cannot be raised on appeal[.]") (citation omitted); *see also Loftus v. Romsa Const., Inc.*, 913 P.2d 856, 862 (Wyo. 1996) (stating "the assertion of an affirmative defense in a motion for summary judgment is not only appropriate, but is just."). Chesapeake waived its affirmative defenses when it did not present them to the district court. Therefore, the district court did not err when it granted summary judgment to Morton. *See TEP Rocky Mountain LLC v. Record TJ Ranch Ltd. P'ship*, 2022 WY 105, ¶ 63, 516 P.3d 459, 478 (Wyo. 2022) ("It is not appropriate for this Court to reverse a district court ruling on grounds that were never presented to it.") (internal quotation and citation omitted).

## III.     Chesapeake violated the Wyoming Royalty Payment Act.

[¶83] The district court found neither party disputed Chesapeake withheld payments to Morton. It also concluded the record did not show Chesapeake placed the disputed production-proceeds in an escrow account as required by the WRPA. On appeal, Chesapeake argues the district court erred in granting summary judgment to Morton because there was a genuine dispute over the amount Morton owed Chesapeake for its share of the costs and proceeds.

[¶84] The WRPA is a remedial statute intended to "stop oil producers from retaining other people's money for their own use." *Indep. Producers Mktg. Corp. v. Cobb*, 721 P.2d 1106, 1110 (Wyo. 1986). The WRPA, in relevant part, provides:

> The proceeds derived from the sale of production from any well producing oil, gas or related hydrocarbons in the state of Wyoming shall be paid to all persons legally entitled thereto, except as hereinafter provided, commencing not later than six (6) months after the first day of the month following the date of first sale and thereafter not later than sixty (60) days after

---

[8] Despite Chesapeake's concession in its opening appellate brief that "no party submitted any statement of material facts and no party submitted the legal standards or elements to any affirmative defense" during the summary judgement proceedings, it later attempts to walk back its position arguing the company raised a factual dispute related to its affirmative defenses in its summary judgment reply brief. After reviewing the parties' briefing below, we find Chesapeake's remedial argument and citations to the record unconvincing. Nonetheless, we disfavor efforts to raise an issue or present new arguments in a reply brief. *See Ultra Res., Inc. v. McMurry Energy Co.*, 2004 WY 121, ¶ 11, 99 P.3d 959, 963 (Wyo. 2004).

the end of the calendar month within which subsequent production is sold, unless other periods or arrangements for the first and subsequent payments are provided for in a valid contract with the person or persons entitled to such proceeds. Payment shall be made directly to the person or persons entitled thereto by the lessee or operator or by any party who assumes such payment obligation under any legal arrangement.

Wyo. Stat. Ann. § 30-5-301(a) (LexisNexis 2023).

Any lessee or operator, purchaser or other party legally responsible for payment who violates the provisions of this article is liable to the person or persons legally entitled to proceeds from production for the unpaid amount of such proceeds, plus interest at the rate of eighteen percent (18%) per annum on the unpaid principal balance from the due date specified in W.S. 30-5-301(a).

Wyo. Stat. Ann. § 30-5-303(a) (LexisNexis 2023).

[¶85] "The statute unambiguously requires the party who has the legal obligation to pay any proceeds from the production of an oil or gas well to make the payments in accordance with either the time set out in the statute or within a time frame established by a legal agreement between the parties." *Ferguson v. Coronado Oil Co.*, 884 P.2d 971, 979 (Wyo. 1994). "Failure to do so results in liability for the amount of the unpaid proceeds plus 18 percent per annum interest." *Id.*

[¶86] As a party to the UOA, Chesapeake accepted the "duties and obligations" as the unit operator and it agreed to comply with all applicable federal and State laws. Chesapeake does not dispute that in July 2020, it began suspending production-proceeds payments due to Morton from the Well and all other Chesapeake-operated wells. Morton was entitled to summary judgment on its WRPA claim because Morton demonstrated it was legally entitled to the withheld amounts.

[¶87] Chesapeake contends summary judgment was not appropriate because Morton did not demonstrate Chesapeake failed to place the disputed funds in escrow. Section 302 of the WRPA creates a clear duty to escrow disputed proceeds for "any reason." *Moncrief v. Harvey*, 816 P.2d 97, 105 (Wyo. 1991) (citing Wyo. Stat. Ann. § 30-5-302). We interpret Section 302 as providing a good faith exception which allows a party legally obligated to pay a royalty to escrow the funds until a determination is made as to who is legally entitled to payment. *Ultra Res., Inc. v. Hartman*, 2010 WY 36, ¶ 71, 226 P.3d 889, 917 (Wyo. 2010). As the operator, Chesapeake had the responsibility to invoke the good faith exception in the WRPA and the absence of such evidence does not preclude Morton from

22

establishing a prima facie case for summary judgment. *See id.,* ¶ 107, 226 P.3d at 925 (affirming district court's finding the operator defendants violated the WRPA when they failed to make required payments to non-operator).

[¶88] Finally, Chesapeake argues there is a genuine factual dispute over the amount of Well proceeds owed by the parties. Before the district court, Chesapeake argued Morton owed the disputed proceeds and Morton was the party unlawfully retaining proceeds from the Northwest Fetter (Deep) Unit.[9] In its required statement of material facts, Chesapeake admitted that it retained approximately $401,010.42 in revenue payments from Morton. The district court did not err in granting Morton summary judgment or in awarding Morton damages in the amount of $401,010.42, plus interest, pursuant to the WRPA.

## *CONCLUSION*

[¶89] We affirm the district court's order granting summary judgment in favor of Morton. Chesapeake agreed to the model language in the 1985 COPAS Form. Considering the plain language of that agreement, the district court properly found Chesapeake breached its contract with Morton and did not err when it declined to consider extrinsic evidence to interpret the unambiguous terms in the parties' agreement.

[¶90] The Supplemental Order was consistent with W.R.C.P. 60(a) because it clarified a clerical mistake and did not improperly modify the district court's Original Order. Additionally, the district court did not err when it rejected Chesapeake's uncontested counterclaims and found Chesapeake's affirmative defenses moot.

[¶91] Finally, the district court properly granted Morton summary judgment on its WRPA claim and awarded damages to Morton because Chesapeake improperly withheld proceeds from the Well in violation of State law.

[¶92] Affirmed.

---

[9] On appeal, Chesapeake also argues summary judgment was not appropriate because Morton did not demonstrate it issued a demand for the proceeds Chesapeake withheld. Specifically, Chesapeake challenges the sufficiency of an affidavit and letter from Morton's counsel to Chesapeake regarding the disputed sum which Morton filed in support of its summary judgment motion. Chesapeake did not raise this argument before the district court and we decline to entertain Chesapeake's new argument because it is "firmly settled in Wyoming jurisprudence" that this Court does not consider for the first time on appeal issues that were neither raised in, nor argued to, the trial court with limited exception not applicable here. *Oatts v. Jorgenson*, 821 P.2d 108, 111 (Wyo. 1991).