# IN THE SUPREME COURT, STATE OF WYOMING

## 2026 WY 16

### OCTOBER TERM, A.D. 2025

### February 2, 2026

GUNWERKS, LLC, a Wyoming limited
liability company,

Appellant
(Plaintiff),

v.

FORWARD CODY WYOMING, INC., a
Wyoming non-profit corporation,

Appellee                                                S-25-0090
(Defendant and Counter/Cross-Claimant),

and

SLETTEN CONSTRUCTION OF
WYOMING, INC., a Wyoming for-profit
corporation and PLAN ONE ARCHITECTS,
a Wyoming for-profit corporation,

Appellees
(Crossclaim Defendants).

*Appeal from the District Court of Park County*
*The Honorable Bill Simpson, Judge*

*Representing Appellant:*
    Timothy M. Stubson and Holly Tysse, Crowley Fleck, PLLP, Casper, Wyoming.
    Argument by Mr. Stubson and Ms. Tysse.

*Representing Appellee Forward Cody Wyoming, Inc.:*
    Jay A. Gilbertz and Kevin K. Kessner, Yonkee & Toner, LLP, Sheridan, Wyoming.
    Argument by Mr. Kessner.

*Representing Appellee Sletten Construction of Wyoming, Inc.:*

Patrick T. Holscher, Schwartz, Bon, Walker & Studer, LLC, Casper, Wyoming. Argument by Mr. Holscher.

*Representing Appellee Plan One Architects.:*

James C. Worthen, Hall & Evans, LLC, Casper, Wyoming. Argument by Mr. Worthen.

*Before BOOMGAARDEN, C.J., and GRAY, FENN, and HILL, JJ., and MCKAY, D.J.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**HILL, Justice.**

[¶1]    Gunwerks, LLC (Gunwerks) entered into an agreement with Forward Cody, Inc. (Forward Cody) and the City of Cody (City), whereby the City and Forward Cody would obtain grants and loans to develop a new manufacturing facility for Gunwerks.  Forward Cody retained the services of Plan One Architects (Plan One) and Sletten Construction of Wyoming, Inc. (Sletten) to design, build, and complete the project.  Gunwerks asserted the facility had numerous defects and sued Forward Cody for breach of contract.  Gunwerks sued Plan One and Sletten, claiming it was a third-party beneficiary of the contracts between Forward Cody and Plan One and Sletten.  The district court dismissed Gunwerks' claims against Plan One and Sletten and granted Forward Cody summary judgment.  We reverse the district court's orders.

## ISSUES

[¶2]    Gunwerks identifies three issues, which we rephrase as two:

1) Did the district court err when it dismissed Gunwerks' claims against Plan One and Sletten?

2) Did the district court err when it granted summary judgment to Forward Cody?

## FACTS

[¶3]    Gunwerks, a Wyoming company that manufactures and sells high-quality firearms and related equipment, wanted to expand its manufacturing facilities.  In evaluating its options, Gunwerks determined it was advantageous to seek grants and loans provided through the Business Ready Community program (BRC) operated by the Wyoming Business Council, even though it would not immediately own the new facility.[1]  As a private entity, however, Gunwerks could not apply for those funds itself.  To access the BRC grants and loans, Gunwerks identified the City, and the Wyoming non-profit corporation, Forward Cody, as entities that could apply for and receive the grants and loans.

[¶4]    Gunwerks entered into negotiations with Forward Cody, who acted as the City's agent, on an agreement that would allow Gunwerks to expand its manufacturing, marketing, and sales operations in the Cody area.  The negotiations included Forward Cody agreeing to develop a proposal and apply for BRC funding to construct a facility to fit Gunwerks' specific needs and provide economic benefits to Cody and the surrounding area.

---

[1] *See* the Wyoming Economic Development Act Wyo. Stat. Ann. § 9-12-103 *et seq.*

1

[¶5]    Gunwerks told Forward Cody it manufactured high quality precision firearms, ammunition, scopes, range-finders and associated equipment and therefore, it needed "sophisticated, complex manufacturing facilities that are designed and constructed to meet the demanding requirements of a business engaged in competition with other firearm and optics manufacturers across the country and globe." Gunwerks and Forward Cody anticipated needing $6,000,000.00 in funding, comprised of a $3,000,000.00 grant and a $3,000,000.00 loan.

[¶6]    On June 26, 2018, Gunwerks and Forward Cody entered into an "engagement letter" which discussed their understanding of moving forward with the development of the project. In the letter, Forward Cody asserted large projects like the Gunwerks project could utilize many hours of Forward Cody staff time, and it would "take responsibility for coordinating all aspects of the project development." The letter stated Forward Cody was looking forward to working with Gunwerks on the manufacturing facility project and pledged constant communication with Gunwerks.

[¶7]    Thereafter, on July 3, 2018, Gunwerks, Forward Cody, and the City entered into a Contingency and Development Agreement (CDA), drafted by Forward Cody. The CDA provided that its purpose was:

> (a) to facilitate the receipt and administration of BRC Funds for the construction of infrastructure, the improvement of real estate, and the construction of a manufacturing facility in Cody, Wyoming (the "Project") through a grant application made to the Wyoming Business Council, and (b) to define the parties' respective expectancies and obligations with respect to the Project.

[¶8]    Under the CDA, the City was required to apply for BRC funding. The CDA also provided the City would act as the fiscal agent for the BRC funds. The City was additionally responsible for processing the paperwork and seeking reimbursement from the Business Council.

[¶9]    The CDA required Forward Cody to act as the City's agent for the purpose of developing and administering the Project. Forward Cody was also required to apply for and administer the BRC funds for the Project. The CDA included a number of other commitments by Forward Cody related to the design and manufacture of the facility. For instance, according to the CDA, Forward Cody was to cooperate with Gunwerks and was responsible for putting together an appropriate team to design and monitor the Project's construction to meet Gunwerks' unique specifications and design criteria, and to award the construction contract to the appropriate contractor. The CDA also provided Forward Cody would require the Project contractors to provide payment and performance bonds as necessary in amounts equal to "the total estimated cost of constructing and completing the

2

Project as a completed and functional manufacturing facility that is suitable for Gunwerks' use according to the specifications and design criteria provided to Forward Cody."

[¶10] The CDA required Gunwerks to provide Forward Cody with the general specifications and design criteria for construction of the Project, which would be shared with the design team (architect) to design the manufacturing facility. The CDA also required Gunwerks to provide the land on which the manufacturing facility was to be built, and to enter into a lease with Forward Cody for at least twenty years, with an option to buy the facility five years after the Project was satisfactorily completed.

[¶11] Funding was procured through the Business Council and the parties moved forward with construction. Before the bid for an architect was released, Gunwerks created an area description to provide the architect with an understanding of Gunwerks' specific design needs and requirements. The area description provided an overview of Gunwerks' manufacturing facility's general description, layout, lighting, electrical access, and HVAC considerations for each anticipated area of the facility. Bidding architects were to use this document in developing a proposal and then work with Gunwerks and Forward Cody to develop a more detailed design with the unique specifications and criteria once selected.

[¶12] Forward Cody, as part of their duties under the CDA, hired Plan One and Sletten to design, build, and complete the Project. Forward Cody entered a contract with Plan One that defined specific roles and responsibilities. Within the Plan One contract, Forward Cody was identified as the "Owner" and Gunwerks was identified as the "Client." The Plan One contract specifically identified the project to be completed as the "Gunwerks Manufacturing Facility." The contract also required Plan One to act as Forward Cody's representative throughout the period of the project's construction. The Plan One contract provided during the design phase, Plan One was to review the Owner's (Forward Cody's) scope of work, budget, and schedule and reach an understanding with the Owner (Forward Cody) of the project requirements. The contract required Plan One to develop a design, set forth in drawings and other documents, appropriate for the project, and it imposed a duty on Forward Cody to provide "full information about the objective, schedule, constraint and existing conditions" for the project. The contract required Forward Cody to approve the design and then Plan One was to prepare construction documents entailing the specific requirements for the project's construction.

[¶13] Forward Cody, Plan One, and Gunwerks worked together to develop the ultimate design specifications, which amounted to over 1,300 pages. Throughout the Project, Forward Cody frequently and continually met and communicated with Plan One.

[¶14] Forward Cody's contract with Sletten similarly identified Forward Cody as the owner, Sletten as the Contractor, Plan One as the architect, and "Gunwerks Manufacturing Facility" as the contemplated project. The Sletten contract provided Plan One would serve as the initial decision maker, and Plan One would serve as the owner's (Forward Cody's)

3

representative during construction of the project. To that end, the Sletten contract gave Plan One the right to reject work that did not conform to the design documents and also charged Plan One with interpreting and deciding matters concerning performance under the requirements of the contract.

[¶15] Construction of the Gunwerks facility commenced. Throughout the construction phase of the Project, Sletten took direction only from Forward Cody and not Gunwerks. Sletten communicated with Forward Cody once or twice a week during construction.

[¶16] When the Project was ultimately completed, Gunwerks identified many defects in both the design and construction resulting in poor climate control in the building, pervasive water leaks, a failing and inadequately designed shooting tunnel, and concrete work that was crumbling before Gunwerks was able to occupy the building. Forward Cody acknowledged Plan One failed to meet its design obligations in several areas and failed to ensure the construction adhered to the agreed upon design. Forward Cody raised the issues related to concrete with Plan One and Sletten and requested the deficiencies be remediated.

[¶17] The construction of the facility resulted in a 157-page punch list of construction issues and items that needed to be corrected and fixed. Many of those punch list issues were never fixed or resolved. Gunwerks asserted the manufacturing facility required substantial repair and replacement work in order to meet the obligations of the CDA and the Plan One and Sletten contracts. Forward Cody acknowledged Sletten's construction deficiencies resulted in Gunwerks not receiving the quality facility to which Gunwerks had agreed.

[¶18] Gunwerks ultimately filed suit against Forward Cody, Plan One, and Sletten, claiming each breached their respective contracts. Gunwerks claimed Forward Cody breached the CDA by: 1) failing to ensure Gunwerks received a manufacturing facility for its use that met its specifications and design criteria without defects; 2) failing to utilize the necessary supervision and control to provide Gunwerks with the benefit of its bargain under the CDA; and 3) failing to ensure Gunwerks received a non-defective facility that met the appropriate standards of professional workmanship and met Gunwerks' specifications and design criteria. Gunwerks also claimed Forward Cody breached the covenant of good faith and fair dealing.

[¶19] Gunwerks additionally asserted breach of contract claims against Plan One and Sletten. Those claims were based on the theory Gunwerks was an intended third-party beneficiary of the contracts between Forward Cody and each entity.

[¶20] Forward Cody filed an answer asserting counterclaims and cross claims against Plan One and Sletten. Plan One and Sletten both filed motions to dismiss against Gunwerks, asserting as a matter of law, Gunwerks was not an intended third-party beneficiary of the respective contracts. The district court agreed with Plan One and Sletten, granting their

respective motions to dismiss; however, they remained in the case due to Forward Cody's claims against them.  The district court sua sponte reconsidered those motions in light of *Peterson v. Meritain*, 2022 WY 54, 508 P.3d 696 (Wyo. 2022), which was issued by this Court after the district court granted the motions to dismiss.  The district court ultimately reaffirmed its initial order granting Plan One's and Sletten's motions to dismiss.

[¶21] Forward Cody made a motion for summary judgment on all claims raised in Gunwerks' amended complaint.  After briefing and argument, the district court granted Forward Cody summary judgment on all claims except a claim of breach of the covenant of good faith and fair dealing.[2]  In general terms, the district court found Forward Cody's duties under the CDA were limited to financial administration of the project.

[¶22] Gunwerks timely appeals, challenging the district court's dismissal rulings and summary judgment ruling.

## ISSUE 1

**Did the district court err when it dismissed Gunwerks' claims against Plan One and Sletten?**

## STANDARD OF REVIEW

[¶23]  Our review of a motion to dismiss under W.R.C.P. 12(b)(6) is de novo.  *Sheesley as Tr. of DCS Tr. dated May 17, 2005 v. AristaTek, Inc.*, 2025 WY 89, ¶ 34, 573 P.3d 535, 547 (Wyo. 2025) (citing *Allred v. Bebout*, 2018 WY 8, ¶ 29, 409 P.3d 260, 268 (Wyo. 2018)).  "We employ the same standards and examine the same materials as the district court: we accept the facts alleged in the complaint or petition as true and view them in the light most favorable to the non-moving party."  *Sheesley*, ¶ 34, 573 P.3d at 547 (quoting *Allred*, ¶ 29, 409 P.3d at 268).  "[W]e focus on the allegations contained in the complaint and liberally construe them in the light most favorable to the plaintiff."  *Sheesley*, ¶ 34, 573 P.3d at 547 (quoting *Allred*, ¶ 29, 409 P.3d at 268).  Dismissal is appropriate only if it is certain from the face of the complaint the plaintiff cannot assert any facts entitling him to relief.  *Sheesley*, ¶ 34, 573 P.3d at 547 (citing *Protect Our Water Jackson Hole v. Wyo. Dep't of Env't Quality*, 2025 WY 36, ¶ 11, 566 P.3d 181, 185 (Wyo. 2025)).  "Dismissal is a drastic remedy which should be used cautiously[.]" *Protect Our Water Jackson Hole*, ¶ 24, 566 P.3d at 188 (quoting *Peterson v. Laramie City Council*, 2024 WY 23, ¶ 9, 543 P.3d 922, 926 (Wyo. 2024)).

## DISCUSSION

---

[2] The parties stipulated to the dismissal, without prejudice, of the breach of the covenant of good faith and fair dealing.

5

[¶24]   We begin our discussion by considering whether it was appropriate for the district court to consider materials not attached to Gunwerks' amended complaint when dismissing its claims against Plan One and Sletten.  The district court considered four materials: 1) Gunwerks' First Amended Complaint; 2) the CDA; 3) the contract between Forward Cody and Plan One; and 4) the contract between Forward Cody and Sletten.  The CDA and the two contracts were not attached to Gunwerks' amended complaint.

[¶25]   "When addressing a motion to dismiss under Rule 12(b)(6), the only materials the district court should consider are 'the complaint and any incorporated attachments . . . .'" *McNair v. Beck*, 2024 WY 85, ¶ 26, 553 P.3d 771, 779 (Wyo. 2024) (quoting *Laramie City Council*, ¶ 16, 543 P.3d at 928) (citations omitted).  In ruling on a motion to dismiss, a court may "consider documents . . . referenced in the complaint if they are central to the plaintiff's claim and the parties do not dispute the documents authenticity." *Laramie City Council* ¶ 16, 543 P.3d at 929 (citation modified).  Here, similar to the facts in *Peterson v. Laramie City Council*, the three documents referenced in Gunwerks' amended complaint were central to its claims and, given Plan One and Sletten attached the respective contracts to their memoranda in support of their motions to dismiss, as well as discussing the CDA in those memoranda, there was no dispute as to their authenticity. *See Id.*  Therefore, the district court properly considered the three documents, and we will examine them as well. *Sheesley*, ¶ 34, 573 P.3d at 547.

[¶26]   Gunwerks' amended complaint alleged breach of contract claims against Plan One and Sletten.  To establish a prima facie case for breach of contract, "the proponent must show a lawfully enforceable contract, an unjustified failure to timely perform all or any part of what is promised therein, and entitlement of [the] injured party to damages." *Drewry v. Brenner*, 2025 WY 121, ¶ 27, 579 P.3d 49, 58 (Wyo. 2025) (quoting *Eiden Constr., LLC v. Hogan Assocs. Builders, LLC,* 2024 WY 138, ¶ 43, 561 P.3d 304, 317-18 (Wyo. 2024)).  Breach of contract claims generally require privity of contract. *Peterson v. Meritain Health, Inc.*, 2022 WY 54, ¶ 22, 508 P.3d 696, 705 (Wyo. 2022) (citing *Cent. Contractors Co. v. Paradise Valley Util. Co.*, 634 P.2d 346, 348 (Wyo. 1981)) (citation omitted); *see also*  17A Am. Jur. 2d Contracts §§ 400, 405 (November 2025 Update).

[¶27]  Gunwerks did not have a contract with either Plan One or Sletten.  Instead, Gunwerks alleged it was a third-party beneficiary of Plan One and Sletten's contracts with Forward Cody.  "Contracts are 'often made in which one party's performance [is] directed to a third party, not a party to the contracting process; that is, not in privity with the contract.'" *Peterson*, ¶ 49, 508 P.3d at 711 (citing 13 Samuel Williston, *Treatise on the Law of Contracts* § 37:1, at 7–9 (Richard A. Lord ed., 4th ed. 2013)).  Thus, "[o]ver time, the traditional view that strangers to a contract have no rights under it was abandoned, and an exception to the need for privity was developed through the doctrine of third party beneficiaries." *Peterson*, ¶ 49, 508 P.3d at 711 (quoting 13 Samuel Williston, *Treatise on the Law of Contracts* § 37:1, at 12–13 (Richard A. Lord ed., 4th ed. 2013)) (citation modified)(footnotes omitted).

6

[¶28] We have further recognized:

> **[A] third-party beneficiary may enforce his rights under a contract**, although not a party to nor specifically mentioned in the contract; but there is more to it than that. An outsider claiming the right to sue must show that it was intended for his direct benefit. Otherwise he may be only an incidental beneficiary because the compelling provisions of a contract require that his claims be satisfied in order to protect another. However, an incidental beneficiary acquires no right of action against the promisor or promisee.

*Peterson*, ¶ 50, 508 P.3d at 711 (citing *Bear v. Volunteers of Am., Wyoming, Inc.*, 964 P.2d 1245, 1252 (Wyo. 1998)) (emphasis added) (citations omitted). "'If the terms of the contract necessarily require the promisor to confer a benefit on a third person, then the contract, and hence the parties thereto, contemplate a benefit to the third person' and that person is an intended beneficiary." *Peterson*, ¶ 50, 508 P.3d at 711 (quoting 13 Williston, *supra*, at 111). We have endorsed the Restatement (Second) of Contracts test to determine whether a third person is an intended beneficiary:

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
>
> > (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
> >
> > (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
>
> (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

*Peterson*, ¶ 50, 508 P.3d at 711–12 (citing Restatement (Second) of Contracts § 302 (Am. L. Inst. 1981); *Cordero Mining Co. v. U.S. Fid. & Guar. Ins. Co.*, 2003 WY 48, ¶ 14, 67 P.3d 616, 622 (Wyo. 2003) (applying the Restatement (Second) of Contracts § 302 test for determining whether a third person was an intended third-party beneficiary of a contract)) (citations omitted).

[¶29] The real question in reviewing third-party beneficiary claims is whether the contracting parties intended the contract to be for the direct benefit of a third party. *Peterson*, ¶ 51, 508 P.3d at 712 (quoting *Cordero Mining*, ¶¶ 9, 12, 67 P.3d at 621). "[A]bsent evidence of such intent, the party is an incidental beneficiary with no enforceable

7

rights under the contract." *Id.* In determining the parties' intent to contract for the benefit of a third party, courts must look at the terms of the entire contract and surrounding circumstances at the time of its execution, including facts showing the relations of the parties, the subject matter of the contract, and the apparent purpose of making the contract. *Peterson*, ¶ 50, 508 P.3d at 712 (citing *Cordero Mining*, ¶ 14, 67 P.3d at 622) (citation modified).

[¶30] In *Peterson*, which was a case dealing with summary judgment and not a Rule 12(b)(6) dismissal, we concluded even though the contract at issue included a provision to avoid creating intended third-party beneficiaries, the agreement, as a whole, and the circumstances surrounding its execution, created a question of fact as to whether the parties intended to benefit third-parties. *Peterson*, ¶ 57, 508 P.3d at 713. In other words, we have held contract clauses that disclaim third-party beneficiaries are not alone conclusively determinative of whether the contracting parties intended the contract to benefit a third-party. Rather, the determination is fact intensive. *Id.*

[¶31] Here, both the Plan One and Sletten contracts contained generic third-party beneficiary disclaimer clauses. Gunwerks asserted notwithstanding these provisions it was a third-party beneficiary of the contracts. In its amended complaint, Gunwerks specifically alleged:

- The CDA provided for the construction of a new manufacturing facility and accompanying offices in Cody, Wyoming

- The CDA included several commitments by Forward Cody that were designed to ensure Gunwerks received a facility that was designed, built, and completed with its unique specifications and requirements included

- The CDA provided that the specifications and design criteria would be developed in conjunction with Gunwerks and that Forward Cody would retain the appropriate design and construction professionals to complete the Project in strict adherence to the specifications and design criteria

- The CDA provided assurances that the completed Project would be suitable for Gunwerks' use and would be completed according to its specifications and design criteria

- Per the CDA, Forward Cody retained the services of Plan One Architects and Sletten Construction to design, build and complete the Project

8

- As the owner of the Project, Forward Cody executed contracts for the design and construction of the Project which were specifically intended to benefit Gunwerks

- The contracts with both Plan One and Sletten recognized the Project was being designed and built for Gunwerks and specifically identified the project as the "Gunwerks Manufacturing Facility"

- Forward Cody's contract with Sletten was intended to and did benefit Gunwerks as a third-party

- Sletten was obligated to construct the Project according to [Gunwerks'] design plans and specifications

- Plan One entered into a contract with Forward Cody in which it agreed to design [the Project per Gunwerks' specifications and needs] and act as the Owner's Representative on the Project

- The contract [with Forward Cody] was intended to benefit Gunwerks as a third-party

Additionally, Gunwerks was not expressly excluded as a third-party beneficiary in the Plan One and Sletten Contracts. *See Peterson*, ¶ 53, 508 P.3d at 712 (where the third-party plan participants were specifically excluded in the no third-party benefit provision).

[¶32]   When considering Plan One's and Sletten's Rule 12(b)(6) motions to dismiss, the district court was required to accept Gunwerks' allegations as true. *Hull v. N. Lincoln Hosp. Dist*., 2025 WY 6, ¶ 23, 561 P.3d 791, 796–97 (Wyo. 2025) (citing *Williams v. Lundvall*, 2024 WY 27A, ¶ 6, 545 P.3d 431, 433 (Wyo. 2024)).  Accepting all facts stated in Gunwerks' amended complaint as true and in the light most favorable to it, as well as considering the CDA, the Plan One contract, and the Sletten contract, we find Gunwerks alleged sufficient facts, which if proven true, could entitle it to relief as a third-party beneficiary of the Plan One and Sletten contracts with Forward Cody. *Sheesley*, ¶ 34, 573 P.3d at 547.  It also alleged sufficient facts to state a claim for relief for breach of contract by Plan One and Sletten.  Thus, we reverse the district court's dismissals of Gunwerks' claims against Plan One and Sletten.

### *ISSUE 2*

**Did the district court err when it granted summary judgment to Forward Cody?**

**STANDARD OF REVIEW**

[¶33] Summary judgment is appropriate when no genuine issue of material fact exists and the prevailing party is entitled to judgment as a matter of law. *Hunter v. Universal Precast Concrete, Inc*., 2025 WY 129, ¶ 19, 581 P.3d 686, 698 (Wyo. 2025) (citing *Chesapeake Expl., LLC v. Morton Prod. Co., LLC*, 2025 WY 15, ¶ 29, 562 P.3d 1286, 1295 (Wyo. 2025)); *see also* W.R.C.P. 56(c). This Court reviews summary judgment decisions de novo, using the same materials and standards as the district court and gives no deference to the district court's conclusions. *Hunter*, ¶ 19, 581 P.3d at 698 (citing *Groff v. McKellar Tiedeken & Scoggin, LLC*, 2025 WY 54, ¶ 14, 568 P.3d 1164, 1167 (Wyo. 2025)). "A district court may grant summary judgment 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Hunter*, ¶ 19, 581 P.3d at 698 (quoting *Weir v. Expert Training, LLC*, 2022 WY 44, ¶ 15, 507 P.3d 442, 447 (Wyo. 2022)).

**DISCUSSION**

[¶34] Wyoming Rule of Civil Procedure 56 governs summary judgment and imposes obligations on both the movant and the nonmovant. *See Hunter*, ¶ 20, 581 P.3d at 698 (citing *Chesapeake Expl., LLC*., ¶ 29, 562 P.3d at 1295; *Kaufman v. Rural Health Dev., Inc*., 2019 WY 62, ¶ 14, 442 P.3d 303, 307 (Wyo. 2019)). If the moving party has made a prima facie case showing there is no genuine issue of material fact and it is entitled to judgment as a matter of law, the burden shifts to the party opposing the motion to present evidence showing a genuine issue of material fact exists. *Hunter*, ¶ 20, 581 P.3d at 698 (citing *Little Med. Creek Ranch, Inc. v. D'Elia*, 2019 WY 103, ¶ 14, 450 P.3d 222, 228 (Wyo. 2019)).

[¶35] To defeat a motion for summary judgment, the opposing party must present competent evidence which would be admissible at trial. *Hunter*, ¶ 21, 581 P.3d at 698–699 (citing *Leonhardt v. Big Horn Cnty. Sheriff's Off*., 2024 WY 128, ¶¶ 16–17, 559 P.3d 1053, 1058–59 (Wyo. 2024)). "[T]he facts presented are considered from the vantage point most favorable to the party opposing the motion, and that party is given the benefit of all favorable inferences that may fairly be drawn from the record." *Hunter*, ¶ 20, 581 P.3d at 698 (quoting *Little Med. Creek Ranch, Inc*., ¶ 14, 450 P.3d at 228).

[¶36] Thus, we begin our discussion with whether Forward Cody made a prima facie showing no genuine issue of material fact existed, and it was entitled to judgment as a matter of law. Gunwerks' amended complaint alleged Forward Cody violated its obligation under the CDA by providing a substandard and defective building to it rather than a manufacturing facility that met its plans, design criteria, and specifications. Forward Cody argues under the CDA it was not contractually obligated to design or construct the building at issue nor was Forward Cody responsible for the design, the quality of construction, or whether the completed building met Gunwerks' needs and requirements.

10

Instead, it claims under the CDA it was merely responsible for the financial administration of the project. In making its argument, Forward Cody claimed the CDA unambiguously required it to only administer funds, and since it fulfilled that duty, there was no actionable breach of the CDA.

[¶37] We, therefore, must interpret the CDA to determine whether Forward Cody had any obligations beyond mere financial administration. *Eiden Constr., LLC*, ¶ 44, 561 P.3d at 318. "Contract interpretation presents questions of law which we review de novo." *Id.* (quoting *Larson v. Burton Construction, Inc.*, 2018 WY 74, ¶ 16, 421 P.3d 538, 544 (Wyo. 2018)). "We apply our well-known rules of contract interpretation to ascertain the parties' intentions." *Schwinn v. Schwinn*, 2025 WY 83, ¶ 13, 573 P.3d 485, 490 (Wyo. 2025) (citation omitted). "The 'language of the parties expressed in their contract must be given effect in accordance with the meaning which that language would convey to reasonable persons at the time and place of its use.'" *Id.*, 573 P.3d at 490–91 (citation modified); *see also Chesapeake Expl., LLC*, ¶ 34, 562 P.3d at 1296. When interpreting contracts, we employ "common sense" and "ascribe the words with a rational and reasonable intent." *Schwinn*, ¶ 13, 573 P.3d at 491 (citation omitted); *see also Eiden Constr., LLC*, ¶ 44, 561 P.3d at 318 (citations omitted). "When the provisions in the contract are clear and unambiguous, the court looks only to the 'four corners' of the document in arriving at the intent of the parties." *Schwinn*, ¶ 13, 573 P.3d at 491 (citation omitted); *see also Eiden Constr., LLC*, ¶ 44, 561 P.3d at 318 (citations omitted). "[W]e will not 'rewrite contracts under the guise of interpretation,' and in the absence of ambiguity, the contract will be enforced according to its terms." *Schwinn*, ¶ 13, 573 P.3d at 491 (citation omitted); *see also Eiden Constr., LLC*, ¶ 44, 561 P.3d at 318 (citations omitted). We interpret a contract as a whole, reading each provision in light of all the others to find the plain and ordinary meaning of the words, and we avoid interpreting a contract in a way that renders any provision meaningless. *Chesapeake Expl., LLC*, ¶ 34, 562 P.3d at 1296 (citation omitted); *Schwinn*, ¶ 13, 573 P.3d at 491 (citation omitted); *Eiden Constr., LLC*, ¶¶ 44, 96, 561 P.3d at 318, 328–29 (citations omitted).

[¶38] Our interpretation of the CDA begins with the recitals. A "recital" is a formal statement in a document of some matter of fact "to explain the *reasons* for the transaction." *Union Pac. Res. Co. v. Texaco, Inc.*, 882 P.2d 212, 222 (Wyo. 1994) (citation omitted) (emphasis in original). Contract recitals can be significant and can express the intent and purposes of a contract, and we have approvingly considered them for contract interpretation in other cases. *Circle C Res. v. Hassler*, 2023 WY 54, ¶ 17, 530 P.3d 288, 293–94 (Wyo. 2023) (citing *Essex Holding, LLC v. Basic Properties, Inc.*, 2018 WY 111, ¶¶ 43–44, 427 P.3d 708, 721–22 (Wyo. 2018) (citations omitted)); *see Horse Creek Conservation Dist. v. State ex rel. Wyo. Att'y Gen.*, 2009 WY 143, ¶ 28, 221 P.3d 306, 316 (Wyo. 2009) (evaluating recitals with other contract components to determine the intent of the parties); *Examination Mgmt. Servs., Inc. v. Kirschbaum*, 927 P.2d 686, 694 (Wyo. 1996) (recitals "are frequently intended to, and often do, shed light on the circumstances the parties wished to have considered in the interpretation of the contract"); *Anderson v. Bommer*, 926 P.2d

11

959, 962 (Wyo. 1996) (concluding the recitals clearly and unambiguously grant the power to enforce the covenants in each and every record property owner); *Union Pac. Res. Co. v. Texaco, Inc.*, 882 P.2d 212, 222 (Wyo. 1994) (determining an operating agreement's recital discloses the parties' "express acknowledgment . . .", recital "conclusively establishes that the parties formed [the] agreement . . ."); and *Morris v. Kadrmas*, 812 P.2d 549, 553 (Wyo. 1991) (recognizing introductory paragraph to the covenants recites that they are for the benefit of each and every lot and the owner or owners thereof, and with the right of enforcement vested in the owner or owners).

[¶39] The CDA's eight recitals state:

> WHEREAS the purpose of the Business Ready Community Program ("BRC") is to promote economic development at the city, town, and county level in order to create additional economic health and a stronger state economy; and

> WHEREAS the CITY and FORWARD CODY desire to facilitate the location of a larger manufacturing facility for GUNWERKS in Cody, Wyoming, and further desire to procure funds to pay for the improvement of real estate in the community, as well as the construction of a build-to-suit facility for GUNWERKS, including site development and infrastructure (the "Project"); and

> WHEREAS the Parties to this Agreement understand and agree that the development of the Project as contemplated under the terms of this Agreement will promote the economic growth of the City of Cody and Park County, Wyoming through the creation of new jobs, the diversification of economic activity, the enhancement of sales taxes, and the improvement of the property tax base; and

> WHEREAS the CITY, FORWARD CODY, and GUNWERKS intend to apply for a Business Ready Community grant for the Project, thereby reducing the total investment of the Wyoming Business Council; and

> WHEREAS the Wyoming Business Council program which provides grant funding authorizes project administration by a community development organization; and

> WHEREAS the City is an eligible Applicant to the Wyoming Business Council for BRC Grants (also referred to as "BRC Funds" or the "BRC Grant"); and

> WHEREAS, based upon the previous experience of the CITY and FORWARD CODY, it is of definable benefit and reasonably necessary to the CITY that FORWARD CODY administer the Project, thus eliminating the need to expend CITY resources for Project administration;
>
> WHEREAS the complex nature of this Project will require significant expenditure of time and resources for Project administration, and FORWARD CODY has the necessary expertise and knowledge in the administration of such projects; and
>
> THEREFORE in consideration for the promises and agreements contained herein, and the parties' respective responsibilities, FORWARD CODY, the CITY, and GUNWERKS agree as follows:

[¶40]  The recitals explain the reason for the CDA and show the parties contemplated that the CDA was more than an agreement to merely procure BRC funding.  The second recital makes it clear the parties considered "the Project" to be not only the application for the BRC funding, but also the construction of a built-to-suit facility for Gunwerks, including site development and infrastructure.  The third recital mentions "development of the Project," which is more than applying for, receiving, and disbursing funds.

[¶41]  The fifth recital provides that "project administration" by Forward Cody is authorized under the BRC program.  The project approved by the Wyoming Business Council was the construction of the facility.  The seventh recital provides Forward Cody, would in fact administer "the Project."  The eighth recital plainly and unambiguously provides the "complex nature" of the Project would "require significant expenditure of time and resources for Project administration" and provides Forward Cody has expertise and knowledge in the administration of such projects.   The noted complexity and need for expertise suggests something more than a simple financial agreement.  This eighth recital also embodies a commitment by Forward Cody to spend significant time and resources on the Project.

[¶42]  Specific provisions of the CDA further establish the CDA was more than a mere financial agreement to procure and administer funding and Forward Cody had more obligations than just applying for, receiving, and disbursing funds.  As noted above, Section I of the CDA states:

### I. PURPOSE

> The purpose of this Agreement is (a) to facilitate the receipt and administration of BRC Funds for the construction of infrastructure, the improvement of real estate, and the construction of a manufacturing facility in Cody, Wyoming (the "Project") through a grant application made to the

13

Wyoming Business Council, and (b) to define the parties' respective expectancies and obligations with respect to the Project. The application for the funding will be available for review at the offices of the City of Cody or the Wyoming Business Council.

Reading this provision together with the recitals, the plain meaning of the purpose of the CDA was two-fold—to secure BRC funding and to build a new, custom-designed manufacturing facility for Gunwerks, which would have the consequential effect of promoting economic growth in the Cody area. The recitals and Section I read together express that this purpose would be accomplished by the City and Forward Cody applying for the BRC funds, receiving and administering the funds, and facilitating and administering the construction of the custom-designed manufacturing facility for Gunwerks. These provisions make clear the parties understood Gunwerks, as a private entity, could not apply for the BRC funds, and that only a community development organization, like Forward Cody, could administer the Project if BRC funding were obtained. Thus, the parties believed a governmental or quasi-governmental entity had to be in charge of getting the custom-designed manufacturing facility for Gunwerks constructed, and that entity was Forward Cody.

[¶43] Section III(A) of the CDA obligated the City to apply for a $3,000,000.00 BRC Grant and $3,000,000.00 loan "for construction of the Project." Section III(B) stated the City (not Forward Cody) would act as fiscal agent for the BRC funds. Section III(C) provided the City would "not be obligated to proceed with the Project, if it does not receive the requested funding from the Wyoming Business Council," nor would the City be obligated to expend funds for the Project in excess of the funds received from the Wyoming Business Council. These Section III provisions, read together with the aforementioned parts of the CDA, show the parties' intent that applying for, receiving, and disbursing the BRC funds was not the entirety of the agreement. Specifically, Section III(A) reiterates the ultimate purpose of the agreement—to obtain funding **for** the construction of the Project. Section III(C) again shows that the funding of the project and the construction of the project were separate concepts because if BRC funding was not obtained, the City did not have to proceed with "the Project." This language evidences there was a funding component and a construction component of "the Project," and both were contemplated within the CDA. This language clearly dispels the notion the agreement's sole purpose was applying for, receiving, and disbursing BRC funds.

[¶44] Moreover, Section IV of the CDA outlined Forward Cody's responsibilities. Section IV(A) made Forward Cody the City's agent for "the purposes of developing and administering the Project and the BRC funds." In the next sentence, the CDA provided "Forward Cody shall **also** apply for and administer the BRC funds for the project." (emphasis added). The plain language of these provisions shows Forward Cody had the responsibility for developing and administering the Project **and** applying for and administering the BRC funds—two different and disparate responsibilities.

14

[¶45]   Section IV(B) required Forward Cody to apply to the Wyoming Business Council's BRC program for $6,000,000.00 in grants and loans "for the construction of the Project." This language again reiterates the reason for the CDA was to construct a custom-designed manufacturing facility for Gunwerks.

[¶46]   Section IV(C) states:

> FORWARD CODY shall cooperate with GUNWERKS and shall procure an appropriate team to design and monitor the construction of the Project to meet GUNWERKS' specifications and design criteria, which will allow a competitive procurement process for contracting the construction of the Project.

This provision obligated Forward Cody to acquire an entity, or entities, to design the Project according to Gunwerks' specifications and design criteria, **and** monitor the construction of the Project.  "Monitor" in this context means to watch, observe, or check especially for a special purpose. (*Monitor*, Webster's Third New International Dictionary (3d ed. 2023)).  Thus, the CDA placed a duty on Forward Cody to hire an appropriate team that was capable of and would both design and monitor the construction of the facility. This obligation includes responsibilities beyond simple financing and imposes duties related to construction.

[¶47]   Section IV(E) provided:

> FORWARD CODY shall require Project contractors to provide payment and performance bonds, as may be necessary, in amounts equal to the total estimated cost of constructing and completing the Project as completed and functional manufacturing facility that is suitable for GUNWERKS' use according to the specifications and design criteria provided to FORWARD CODY.

This provision demonstrates, again, the overarching purpose of the CDA, which was the building of a suitable and functional manufacturing facility.  This provision also shows Forward Cody's obligation to ensure the contractors designed and constructed the manufacturing facility according to Gunwerks' specifications and design criteria by requiring them to post the performance bonds.

[¶48]   Section V(A) required Gunwerks to provide Forward Cody with the general specifications and design criteria for construction of the Project at its own expense.  Section V(B) required Gunwerks to contribute five acres of real property, valued at approximately $250,000.00, for development of the Project.  Section V(D) provided Gunwerks understood and agreed Forward Cody would use any and all BRC funds it received for the construction

of the Project in order to make the Project suitable for Gunwerks' reasonable use. These Section V provisions again reiterate the main purpose of the CDA was to deliver a facility suitable for Gunwerks' use.[3] This purpose would be accomplished by Gunwerks providing the valuable property and the specifications and design criteria to Forward Cody, and Forward Cody would ensure the funds obtained would be used to make the facility meet Gunwerks' expectations.

[¶49]   Viewing the CDA in its entirety and using common sense in considering the plain language of each provision and recital in light of the others, we conclude Forward Cody has duties under the CDA that are more than administering funds. The City and Forward Cody did not, one day, randomly decide to build a generic building to encourage general economic development in the area. Instead, Gunwerks started negotiating with them to build Gunwerks a custom-designed manufacturing facility, using state BRC funds. That purpose—building Gunwerks a unique, custom-designed manufacturing facility—drove the CDA; and that purpose is embodied in the plain language of the CDA. To accomplish that purpose, the CDA places  responsibilities on Forward Cody to administer the entire project, which includes construction.

[¶50]   Thus, Forward Cody failed to carry its prima facie burden to show it was entitled to summary judgment under the theory the CDA was a mere financing agreement, and it had no responsibility for construction. The CDA obligated Forward Cody to supervise and administer the entire Project, ensuring the contractors designed and constructed the manufacturing facility according to Gunwerks' specifications and design criteria. Accordingly, the burden never shifted to Gunwerks to present admissible evidence demonstrating a genuine issue of material fact existed. Nevertheless, the entire record shows a genuine issue of material fact exists as to whether Forward Cody breached the CDA as pled by Gunwerks.

[¶51]   We find there are genuine issues of material fact which preclude summary judgment on the question of whether Forward Cody breached the CDA. We therefore conclude the district court erred in granting summary judgment.

## CONCLUSION

[¶52]   We reverse the district court's orders granting the motions to dismiss. We also reverse the district court's order granting summary judgment.

---

[3] Section V(H) also references the June 25, 2018 engagement letter indicating the Engagement Letter informed the parties' understanding of the purpose of the CDA. The engagement letter provided Forward Cody would "take responsibility for coordinating all aspects of the project development."